Filed 12/13/13 Lewis, Miller & Co. v. Carrick CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| LEWIS, MILLER & COMPANY, INC.,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>PAUL M. CARRICK,<br><br>Defendant and Appellant. | H038152<br>(Santa Clara County<br>Super. Ct. No. CV194886)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br><br>**NO CHANGE IN THE JUDGMENT** |

It is ordered that the opinion filed herein on November 22, 2013, be modified as follows:

1. On page 1, in the first full paragraph, replace the fourth line (which states: "Firefighters met them en route. Based on Carrick's condition, the firefighters called") with the following: "The firefighters who met them en route called".

2. On page 3, in the second full paragraph, after the sentence that ends with the phrase "near the Quail Rocks area," insert the following:

> While en route, Cunningham had been informed that, because of their location in the mountains, it would take at least 40 minutes for a ground ambulance to arrive and less than 15 minutes for a CALSTAR helicopter to arrive. Based on this timing, the fact that the firefighters could not

administer medications, and the need to provide a fast response, Cunningham asked his captain to call CALSTAR.

3. On page 4, delete the following language, which follows the phrase "from Carrick" on the first line:

Cunningham had been informed that, because of their location in the mountains, it would take at least 40 minutes for a ground ambulance to arrive and less than 15 minutes for a CALSTAR helicopter to arrive. Based on all these factors, Cunningham asked his captain to call CALSTAR.

The petition for rehearing is denied.

There is no change in the judgment.

Dated:_____

_____
Márquez, J.


_____
Elia, Acting P.J.


_____
Bamattre-Manoukian, J.

Filed 11/22/13  Lewis, Miller & Co. v. Carrick CA6 (unmodified version)

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| LEWIS, MILLER & COMPANY, INC., | H038152 |
| Plaintiff and Respondent, | (Santa Clara County Super. Ct. No. CV194886) |
| v. | |
| PAUL M. CARRICK, | |
| Defendant and Appellant. | |

Appellant Paul M. Carrick was stung 80 to 100 times by bees.  After he started to go into anaphylactic shock, his beekeeping helper called 911 and persuaded his neighbors to drive him from a remote location in the Santa Cruz Mountains to a hospital. Firefighters met them en route.  Based on Carrick's condition, the firefighters called California Shock Trauma Air Rescue (CALSTAR).  CALSTAR flight nurses treated Carrick and arranged for him to be transported by helicopter to a hospital.  Carrick subsequently refused to pay CALSTAR's bill for $31,197.59.  CALSTAR assigned its rights to respondent Lewis, Miller and Company, Inc. (LMC), which sued Carrick in this debt collection action.  The case was tried to the court, which concluded that Carrick had entered into an oral contract with CALSTAR for treatment and transport, and entered a judgment in favor of LMC.

On appeal, Carrick raises claims of error regarding delays in discovery and the exclusion of evidence at trial.  He asserts a variety of legal errors.  But Carrick

misunderstands our standard of review and uses the appeal as an opportunity to reargue his case. We conclude that substantial evidence supports the court's findings on contested factual issues and that Carrick has not met his burden of demonstrating error on appeal on the other points he raises. We will therefore affirm the judgment.

## FACTS

Both sides presented evidence at trial. LMC's witnesses were firefighter Christopher Cunningham, CALSTAR's flight nurses Francine Abbruzzese[1] and Kristine Tate, and CALSTAR's accounts receivables manager, John Bunner. Carrick testified and represented himself at trial.

Carrick lives in a remote area of the Santa Cruz Mountains. He has worked as an emergency medical technician (EMT), although the record does not disclose when he did such work.[2] He is also a beekeeper.

### *Carrick's Testimony*

Around 6:30 p.m. on August 24, 2010, while tending his honey bees, Carrick and his helper, Deann Hamernick, were both stung multiple times. According to the first responders, Carrick was stung 80 to 100 times. Hamernick went inside, while Carrick continued to tend the bees. Carrick testified that later, he went into the kitchen and said " 'I am not feeling too good.' " But since he did not have health insurance, he told Hamernick he did not want her to call 911. Carrick then said, " 'I'm going into anaphylactic" shock. Carrick testified that he "fell down unconscious and hit the chair

---

[1] Abbruzzese's first name is listed as both "Frances" and "Francine" in the record. We shall use "Francine," which is the name she used on her written report for CALSTAR.

[2] Carrick's opening brief cites his EMT registry number and says it expires on November 30, 2013. This information was not before the trial court.

2

and broke it on the floor and hurt [his] head." Carrick, who was 62 years old, began shaking on the floor. Hamernick called 911. She later told Carrick, " 'Well, I couldn't stand to see you die, so I called 911.' " Carrick testified that initially, he "was in a pretty deep coma" and shock.

There was some delay in getting an emergency crew to respond and Carrick and Hamernick had difficulty communicating with the 911 operator because of poor phone reception, so they asked Carrick's neighbors, Aimee Levine and Josh Harness, to drive them down the mountain. Levine and Harness placed Carrick in the front seat of their van and Harness drove to Quail Rocks, where they met an emergency crew from the Burrell CAL FIRE[3] fire station. Carrick testified that Levine was "very worried" about him because he "wasn't breathing, hadn't breathed, and [his] heart was not functioning."

### *Testimony of Firefighter Christopher Cunningham*

Cunningham and two other firefighters responded to the 911 call. Cunningham was the primary crew member assigned to Carrick. As they headed "up the hill," they encountered Levine's van on Loma Prieta Avenue near the Quail Rocks area. When the firefighters arrived, Carrick was sitting upright in the front passenger seat of the van. Levine told Cunningham that, during the drive, Carrick had stopped breathing completely for about 30 seconds. She said she reached around the seat and "pulled on" Carrick's chest until he started breathing again.

Cunningham leaned Carrick's seat back to treat him for shock, placed him on oxygen, and assessed his vital signs. Cunningham observed that Carrick's lips were cyanotic (blue), that hives were starting to form on his chest and abdomen, and that he was having trouble breathing; the firefighters were also unable to get a blood pressure

---

[3] CAL FIRE is an acronym used by the California Department of Forestry and Fire Protection. (See e.g., http://calfire.ca.gov/about/about.php [as of Nov. 21, 2013].)

from Carrick. Cunningham had been informed that, because of their location in the mountains, it would take at least 40 minutes for a ground ambulance to arrive and less than 15 minutes for a CALSTAR helicopter to arrive. Based on all these factors, Cunningham asked his captain to call CALSTAR.

After placing Carrick in the shock position and giving him oxygen, the firefighters "were able to finally get a blood pressure," but it was low. Cunningham told Carrick, "We're going to need to transport you to the hospital." Carrick nodded. Cunningham said " 'We have a helicopter on the way' " and Carrick "kind of grunted" in response. Since Carrick seemed to understand that he needed to go to the hospital, Cunningham assumed the grunt meant "yes" and "get me there."

After five to ten minutes on oxygen, Carrick was able to talk and said his pain level was an "8." A short time later, Cunningham reassessed Carrick as the helicopter landed. Upon reassessment, Carrick reported that his pain was a "3" and was able to explain how the bee stings occurred. But Carrick was still breathing heavily, with wheezes; he was slightly disoriented; and his lips were still cyanotic.

The helicopter landed in a nearby field. A passerby with a flatbed truck transported the flight nurses from the helicopter to the van where Carrick was seated. Other volunteers arrived and "worked the landing zone."

After the CALSTAR nurses arrived, Cunningham "backed away," because they were in a confined space. He, therefore, could not hear whether Carrick consented to be transported by helicopter. Later, he did hear Carrick refuse to be intubated. Cunningham did not see Carrick resist treatment or transport, except for intubation. After the flight nurses evaluated Carrick, they took him to the flatbed truck on a spine board and transported him to the helicopter. Cunningham was with Carrick when he was loaded onto the helicopter.

While Cunningham evaluated and treated Carrick, his partners assessed Hamernick. As the helicopter took off, Hamernick started to react to her bee stings in an

4

anaphylactic way.  By then, a ground ambulance had arrived.  The ground ambulance took Hamernick to a hospital.

Cunningham works on a Basic Life Support rig and is not allowed to carry medications like Epinephrine.  He testified that he may only administer sugar or oxygen or the patient's own medication (i.e., he may give Epinephrine using the patient's Epi-pen).  The firefighters never considered letting Levine and Harness transport Carrick to the hospital because, as civilians, they would provide a lesser level of care, their van was not an ambulance, and the situation was stressful.  They also had their two children with them.

***Testimony of Flight Nurses Francine Abbruzzese and Kristine Tate***

CALSTAR flight nurses Francine Abbruzzese and Kristin Tate responded to a call regarding a possible mission in the Santa Cruz Mountains.  After checking the weather to make sure they could fly, they accepted the mission.

The evidence included CALSTAR's detailed Transport Medical Record. According to that report, CALSTAR received the call at 8:26 p.m.  The helicopter was en route 13 minutes later at 8:39 p.m., arrived on scene 20 minutes after that at 8:59 p.m., departed 32 minutes later at 9:31 p.m., and arrived at the hospital nine minutes later at 9:40 p.m.  It took about three minutes to travel from the helicopter to Levine's van by truck.  Allowing for travel time to and from the helicopter, the nurses spent approximately 26 minutes treating Carrick at the scene before transport.

Abbruzzese testified that when they first contacted Carrick at 9:03 p.m., she said, "Hi, my name is Francine.  This is Kris.  We're both nurses with CALSTAR.  We'd like to examine you and transport you to Valley Medical Center by helicopter.  Do we have your permission to do so?"  Both nurses testified that in response, Carrick "nodded his head" and said the word "Yes."  Abbruzzese testified that Carrick never refused transport.

When the nurses arrived, Carrick was seated in the van and was having a "hard time breathing." The firefighters gave the nurses a history of multiple bee stings and described what had transpired up to that point. In their report, the nurses noted that upon their arrival, Carrick was "awake, alert and oriented x 3"; his coma score on the Glasgow scale was 15 out of 15 (normal) and remained the same throughout their encounter. He was perspiring heavily and had small raised welts on his face, neck, and both legs. Abbruzzese testified that Carrick's presentation was consistent with anaphylactic shock. Since he was having trouble breathing, the nurses determined that keeping his airway open was a priority. The nurses gave him 0.3 mg of Epinephrine and started him on intravenous fluids; Carrick's condition improved with treatment. Abbruzzese believed the situation was an emergency. Tate testified that it was necessary to fly Carrick to the hospital because he was in "significant distress," it was a life-threatening situation, and he could have died.

At 9:18 p.m., fifteen minutes after the flight nurses first made contact with Carrick, they removed him from the van and placed him on a spine board for transport to the helicopter. Carrick complained of fatigue and increased difficulty breathing. The nurses noted "slight increased swelling" of Carrick's tongue and discussed "advanced airway placement" with him. Carrick refused intubation, saying he did not want a breathing tube down his throat. Carrick said that as long as he was awake and breathing on his own, he did not want any airway intervention; but if he passed out, the nurses had his permission to do it. The nurses noted that Carrick was able to "reverbalize the risk of [his] decision" to refuse airway intervention. Abbruzzese testified that this was the only type of treatment Carrick refused and that he otherwise continued to consent to care and transport. A few minutes later, the nurses gave him 50 milligrams of Benadryl. At 9:30 p.m., just before take-off, the nurses noted that Carrick's tongue was still swollen; he continued to complain of difficulty breathing and refused airway intervention a second time. At take off, Carrick's blood pressure was still low, but it slowly improved on the

6

way to the hospital. According to Abbruzzese, Carrick's vital signs did not stabilize until they reached the hospital.

### Testimony of CALSTAR Accounts Receivables Manager John Bunner

On September 2, 2010, CALSTAR billed Carrick $31,197.59. The bill included the "Base Rate" of $27,015.43; a "Loaded Miles" charge of $4,029 for transporting Carrick 17 miles ($237 per mile), and $153.16 for oxygen. Bunner testified that CALSTAR is a non-profit company, that these are the usual and customary charges for its services and in the industry, and that insurance companies pay these rates.

In September and November 2010, CALSTAR sent Carrick three letters inquiring into the status of the bill. Carrick never responded to the letters. According to Bunner, someone at CALSTAR spoke to Carrick once by telephone and referred him to Valley Medical Center for assistance in applying for aid programs. CALSTAR also offered pre-screening for its hardship program, but got no response from Carrick. On February 16, 2011, CALSTAR assigned its rights in the account to LMC.

Carrick challenged the reasonableness of CALSTAR's charges with a brochure from a helicopter company that charges $325 for 108-mile helicopter tours from Watsonville to Big Sur. Bunner acknowledged that CALSTAR's services are expensive, but testified that they are distinguishable from helicopter tours because of the type of helicopter involved, as well as the cost of retrofitting it to carry medical equipment and of having highly trained nurses, pilots, mechanics, and other support personnel available around the clock.

### Additional Testimony by Carrick

Carrick testified that he was "unconscious through this whole affair," that he could not remember being asked whether he wanted to be transported by CALSTAR, that he could not "remember either accepting or declining" helicopter transport, and that he was

7

unable to recall what occurred that day.  But he does recall being asked about intubation and "emphatically" declining it.

## PROCEDURAL HISTORY

LMC filed its complaint for "Money Due on Agreement for Emergency Services" on February 23, 2011.  The complaint contains causes of action based on book account, account stated, quantum meruit, and oral contract theories.

The case was tried to the court in February 2012.  Neither party requested a statement of decision.  The court found that Carrick had consented to be transported by helicopter.  The court entered judgment for LMC for $35,788.94 (the amount billed plus $4,591.35 in prejudgment interest) and awarded LMC its costs of suit.

Carrick filed a motion for new trial, arguing that he was entitled to a new trial so that two witnesses who were unavailable for trial (Hamernick and Frank Deto) could testify.  Carrick alleged that their testimony would support his contentions that he did not consent to air transport and did not have the ability to consent because of his medical condition.  The motion also repeated other arguments Carrick had made at trial.  At the hearing on the new trial motion, Carrick told the court what Deto and Hamernick would have said had they appeared at trial.  The court denied the motion for new trial.  Carrick appeals.

## DISCUSSION

Before addressing Carrick's many contentions, we shall discuss three important rules of appellate practice that guide our review of this case:  the presumption of correctness, the doctrine of implied findings, and the substantial evidence rule.

8

### *The Presumption of Correctness*

"To this appeal, like every other, we apply basic tenets prescribing the scope and limits of appellate review, starting with the most fundamental—the presumption of correctness. An appealed judgment is presumed to be correct. We will indulge all intendments and presumptions to support the judgment on matters as to which the record is silent and prejudicial error must be affirmatively shown." (*Shaw v. County of Santa Cruz* (2008) 170 Cal.App.4th 229, 267 (*Shaw*), citing *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 (*Denham*) and *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.)

### *Doctrine of Implied Findings*

Pertinent here, and not addressed by either party, is the doctrine of implied findings. This doctrine applies when the trial court does not issue a statement of decision, as occurred here.[4] The doctrine requires the appellate court to presume that the trial court made all factual findings necessary to support the judgment for which substantial evidence exists in the record. "The necessary findings of ultimate facts will be implied and the only issue on appeal is whether the implied findings are supported by substantial evidence." (*Shaw*, *supra*, 170 Cal.App.4th at p. 267.)

---

[4] Code of Civil Procedure section 632 provides in pertinent part that "upon the trial of a question of fact by the court, written findings of fact and conclusions of law shall not be required. The court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principle controverted issues at trial . . . ." Code of Civil Procedure section 634 provides in part that "When a statement of decision does not resolve a controverted issue, or if the statement is ambiguous and the record shows that the omission or ambiguity was brought to the attention of the trial court . . . it shall not be inferred on appeal . . . that the trial court decided in favor of the prevailing party as to those facts or on that issue." As we have noted, neither party requested a statement of decision in this case.

9

Although there are instances in which a court's oral comments may be valuable in illustrating the trial judge's theory, they may never be used to impeach the order or judgment on appeal. (*In re Marriage of Ditto* (1988) 206 Cal.App.3d 643, 646 (*Ditto*).) "This is because a trial court retains inherent authority to change its decision, its findings of fact, or its conclusions of law at any time before entry of judgment and then the judgment supersedes any memorandum or tentative decision or any oral comments from the bench. [Citations.] Thus, a trial judge's prejudgment oral expressions do not bind the court or restrict its power to later declare final findings of fact and conclusions of law in the judgment. [Citation.] In the absence of a statement of decision, a reviewing court looks only to the judgment to determine error. [Citation.]" (*Shaw*, *supra*, 170 Cal.App.4th at p. 268.) When, as here, the option of requesting a statement of decision is available, "the trial court's less formal comments on the record or in the minutes are insufficient to form the basis of reversible error." (*Ibid.*) "A formal statement of decision enables a reviewing court to determine what law the trial court employed. A failure to request a statement of decision results in a waiver of findings and conclusions necessary to support the judgment and we will accordingly infer such conclusions." (*Id.* at p. 269.) "Moreover, we will affirm a judgment correct on any legal basis, even if that basis was not invoked by the trial court. [Citation.] There can be no prejudicial error from erroneous logic or reasoning if the decision itself is correct." (*Ibid.*)

***Substantial Evidence Standard of Review***

Some of Carrick's points challenge the trial court's factual findings; he reargues the evidence and asks this court to reweigh the evidence. As we shall explain, that is not our role under the substantial evidence standard of review.

"The trial court's factual findings . . . are subject to limited appellate review and will not be disturbed if supported by substantial evidence." (*Williams v. Saunders* (1997) 55 Cal.App.4th 1158, 1162.) "When a trial court's factual determination is attacked on

10

the ground that there is no substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873-874 (*Bowers*), original emphasis omitted.) As long as there is substantial evidence, the appellate court must affirm, even if the reviewing justices personally would have ruled differently if they had presided over the proceedings below and even if other substantial evidence supports a different result. (*Id.* at p. 874.)

An appellate court is "not in a position to weigh any conflicts or disputes in the evidence. Even if different inferences can reasonably be drawn from the evidence, [the appellate court] may not substitute [its] own inferences or deductions for those of the trial court. [Its] authority begins and ends with a determination of whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, which will support the judgment. [Citations.] Therefore, we must consider all of the evidence in the light most favorable to the prevailing party, giving that party the benefit of every reasonable inference from the evidence tending to establish the correctness of the trial court's decision, and resolving conflicts in support of the trial court's decision." (*Estate of Beard* (1999) 71 Cal.App.4th 753, 778-779.) Under the substantial evidence standard, the appellate court will not reweigh the evidence. That function belongs exclusively to the trier of fact (the trial judge in cases such as this that are tried to the court). (*Shamblin v. Brattain* (1988) 44 Cal.3d 474, 479.)

"Substantial" evidence is not synonymous with "any" evidence. (*DiMartino v. City of Orinda* (2000) 80 Cal.App.4th 329, 336.) "Substantial" evidence is evidence of "ponderable legal significance"; it must be "reasonable . . . , credible, and of solid value . . . ." (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.) "Thus, the focus is on the quality, not the quantity of the evidence. Very little solid evidence may be 'substantial,' while a lot of extremely weak evidence might be

11

'insubstantial.' " (*Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 871.) The testimony of a single witness may constitute "substantial" evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.)

### *Discovery Issues*

Carrick complains that "excessive delays" by the trial court in issuing discovery subpoenas prevented him from obtaining discovery and that "many witnesses were excluded by the Court's . . . delay." According to Carrick, he sent blank subpoenas to the court four times before a judge signed them, which resulted in a two-month delay and cost him "valuable discovery time." According to his brief, the first time he sent the subpoenas to the court, the clerk sent them back to him "with a note about typos in the Court address." Thus, Carrick was partially responsible for any delay. Carrick's brief does not explain why the subpoenas were returned to him on the other occasions. Carrick also complains that CALFIRE (which is not a party) did not provide him with the names of the firefighters involved in his treatment until December 27, 2011, eight weeks before trial.

We begin by noting that none of the facts Carrick relies on to make this argument are in the record on appeal. Generally, documents and facts that were not presented to the trial court cannot be considered on appeal. (*Pulver v. Avco Financial Services* (1986) 182 Cal.App.3d 622, 632 (*Pulver*); *In re B.D.* (2008) 159 Cal.App.4th 1218, 1239 ["It has long been the general rule . . . that an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of the matters which were before the trial court for its consideration"].) An appellate court will generally disregard arguments that are based on facts that are outside the record or that were improperly included in the record. (*Kendall v. Allied Investigations, Inc*. (1988) 197 Cal.App.3d 619, 625 (*Kendall*); *Pulver*, *supra*, at p. 632.) In addition, it does not appear that Carrick made any discovery motions or asked the court for a trial continuance based on the alleged delays he encountered in

conducting discovery. An appellate court "ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, superseded by statute on another ground as stated in *In re S.J.* (2008) 167 Cal.App.4th 953, 962.) "Although the loss of the right to challenge a ruling on appeal because of the failure to object in the trial court is often referred to as a 'waiver,' the correct legal term for the loss of a right based on failure to timely assert it is 'forfeiture,' because a person who fails to preserve a claim forfeits that claim." (*In re S.B.,* at p. 1293, fn. 2.) We conclude that by failing to raise the alleged discovery errors in the trial court, Carrick has forfeited those claims on appeal.

Even if we were to exercise our discretion to excuse the forfeiture, which we do only in rare circumstances (*In re S.B.*, *supra*, 32 Cal.4th at p. 1293), Carrick does not explain how he was prejudiced by the alleged delays. He does not identify any specific witnesses or evidence that he was unable to present at trial because of the delay in issuing subpoenas. He had the names of the firefighters eight weeks before trial, in sufficient time to take their depositions.

The only evidence that Carrick offered that the court excluded were the transcripts of the depositions of Hamernick and Bill Finch (the fire captain for CALFIRE) taken on January 9, 2012 (six weeks before trial). The transcripts were excluded because Carrick took the depositions without giving notice to opposing counsel and LMC was, therefore, denied the opportunity to cross-examine those witnesses. Carrick told the court Hamernick was unavailable for trial because she was recovering from surgery. Hamernick's deposition is in the record. Hamernick essentially testified to the same facts as Carrick: she explained how the bee stings occurred, that she called 911, and what transpired before the firefighters arrived.[5] Thus, her testimony was cumulative of

---

[5] LMC introduced a copy of Hamernick's deposition transcript in support of its opposition to Carrick's motion for new trial.

Carrick's. Carrick did not say why Finch was unavailable for trial. Finch's deposition transcript is not in the record, but Carrick's description of Finch's testimony suggested that it was cumulative of Cunningham's testimony.

Other evidence that was not admitted included the written statement of Frank Deto and Aimee Levine's December 12, 2010 letter to CALSTAR. At trial, Carrick acknowledged that both statements contained hearsay, said Deto could not be at trial "for medical reasons," and did not explain why Levine could not be there. Even though the documents were not admitted, the trial court allowed Carrick to make an offer of proof at trial regarding what both witnesses would say, which was not objected to by LMC. The content of Levine's and Deto's statements was therefore before the court. Nothing in the record supports the conclusion that the discovery delay Carrick complains of prevented him from obtaining a fair trial or presenting his case.

For all of these reasons, we reject Carrick's claim of error arising from purported delays in obtaining discovery subpoenas and the names of the firefighters who treated him.

*Exclusion of Evidence*

**Evidence of Abbruzzese's Salary**

Carrick contends the trial court erred when it excluded evidence of Abbruzzese's salary. Carrick asked Abbruzzese what her salary was, LMC objected on relevance grounds, and the court sustained the objection. Carrick did not follow up or explain why the evidence was relevant. On appeal, he argues that "[t]he answer to this question was foundational to proving that financial motives effected the nurse's answers."

We review the trial court's decisions on the admissibility of evidence, including the relevance of proffered evidence, for an abuse of discretion. (*Shaw, supra,* 170 Cal.App.4th at p. 281.) Under that standard, the appropriate test is whether the trial court

14

exceeded the bounds of reason, all circumstances before it being considered. (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 598.) Appellate courts will disturb discretionary trial court rulings only when there is "a clear case of abuse" and "a miscarriage of justice." (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 331.)

We find no abuse of discretion here. Both nurses testified that they were employed by CALSTAR. A reasonable inference from that fact is that CALSTAR paid their salaries. The nurses also testified regarding their training, certifications, and experience. Reasonable inferences from that testimony are that they were highly skilled and that they were paid a professional salary commensurate with their skill level. At trial, Carrick argued that the nurse's written report did not say he consented to transport, that it was only after he disputed the bill that the nurses said he consented, and that "their motives for not contesting [*sic*] it are clear because they—that's how they get paid." The important fact for the purpose of arguing the nurses' bias was that they were paid by CALSTAR, not the amounts they were paid. Therefore, we conclude that the court did not abuse its discretion when it excluded evidence of the amounts the nurses were paid.

**Exclusion of Frank Deto's Written Statement**

Carrick contends the court erred when it excluded a notarized statement from Frank Deto in which Deto stated that he saw Carrick being prepared for transport and that Carrick was "half conscious but disoriented" and "did not consent to transport." Although a copy of Deto's statement is in the record, there is nothing in the record indicating that Carrick offered Deto's written statement as evidence at trial.[6] The fact that Carrick did not offer it into evidence belies his assertion that the court erred in

---

[6] The statement was not marked or identified on the record. It is not listed with the other exhibits in the minute order of the trial or the index of exhibits in the reporter's transcript. We note also that it was notarized on March 12, 2012, almost three weeks after the trial.

15

excluding it.  There was nothing to exclude.  For this reason, we hold that Carrick has not demonstrated prejudicial error in the alleged exclusion of Deto's statement.

### Exclusion of Hamernick's Deposition and Note From Her Doctor

Carrick argues that the court erred when it excluded the transcript of Hamernick's deposition testimony and a note from her doctor explaining why she could not appear at trial.  But he does not provide us with any reasoned argument or citation to authority that supports the conclusion that the court abused its discretion when it excluded those items.

As we have said, in conducting our appellate review, we presume that the appealed judgment or order is correct.  " 'All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' " (*Denham, supra,* 2 Cal.3d at p. 564; *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 (*Cahill*).)

Under these principles, Carrick has the burden of overcoming the presumption of correctness.  That burden includes providing this court with reasoned argument and legal authority on each point raised.  (*Niko v. Foreman* (2006) 144 Cal.App.4th 344, 368 (*Niko*); *Cahill*, *supra*, at p. 956.)  " '[E]very brief should contain a legal argument with citation of authorities on the points made.  If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 793 (*Stanley*); see, e.g., *In re Marriage of Falcone & Fyke* (2012) 203 Cal.App.4th 964, 1004 ["appellate court can treat as *waived* or *meritless* any issue that, although raised in the briefs, is *not supported by pertinent or cognizable legal argument or proper citation of authority*" (italics in original)].)

As we noted, the court excluded Hamernick's deposition transcript because LMC was not given notice of the deposition and an opportunity to cross-examine her.  Carrick does not provide us with any argument or citation to authority that support the conclusion that the court abused its discretion when it excluded the transcript on that ground.  Nor

16

does he provide argument and authority supporting the contention that the court abused its discretion when it refused to accept the doctor's note.  For this reason, we conclude that he has waived these contentions on appeal.

Moreover, as we have stated, Hamernick's testimony was duplicative of Carrick's. Consequently, Carrick was not prejudiced by the exclusion of either the deposition transcript or the doctor's note.

### Exclusion of Brochure From Specialized Helicopters

In his cross-examination of Bunner, Carrick attempted to introduce evidence that CALSTAR's fees were excessive by introducing a brochure from Specialized Helicopters (SH) of Watsonville, which offers helicopter tours.  Although Carrick was allowed to question Bunner about CALSTAR's rates in comparison to the rates charged by SH, the court refused to admit the brochure into evidence on the grounds that it was not properly authenticated and that it was irrelevant.

On appeal, Carrick makes the bare assertion that the court erred when it refused to consider the brochure, but does not provide any reasoned argument or citation of authority supporting the assertion that the court abused its discretion when it excluded this evidence on relevance and authentication grounds.  Carrick does not even mention the court's reasons for excluding the brochure.  As we have stated, Carrick's burden on appeal includes making reasoned arguments with citation to authority on each point raised.  (*Niko, supra,* 144 Cal.App.4th at p. 368.)  This requires more than making a bare assertion that the trial court was wrong and leaving it to the appellate court to figure out why.  It is not our role to act as counsel for the appellant and construct legal arguments that undermine the judgment and defeat the presumption of correctness.  (*Ibid.*)  For this reason, Carrick has waived any claim of error related to the exclusion of the SH brochure. (*Stanley*, *supra*, 10 Cal.4th at p. 793.)

***Standard of Proof***

Under the heading "Clear and Convincing Standard of Proof," Carrick quotes from *DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Cafe & Takeout III, Ltd.* (1994) 30 Cal.App.4th 54 (*DRG*). *DRG* was an action for breach of a commercial lease in which the lessor alleged that the lessee had waived certain contingencies in the lease. (*Id.* at p. 58.) One of the issues on appeal was the standard of proof for a waiver of rights under a commercial contract. The court explained, " ' "Waiver is the intentional relinquishment of a known right after knowledge of the facts. [Citations]. The burden, moreover, is on the party claiming a waiver of a right to prove it by clear and convincing evidence that does not leave the matter to speculation, and 'doubtful cases will be decided against a waiver.' " ' " (*Id.* at p. 60, quoting *City of Ukiah v. Fones* (1966) 64 Cal.2d 104, 107-108.)

It is not clear what Carrick is arguing under this point. His argument heading and the discussion of *DRG* suggest that his contention is that the trial court applied the wrong standard of proof. However, he argues, "I deny any waiver of my right not to contract with CALSTAR or any provider of treatment and transport" and "I did not give an affirmative answer to Chris Cunningham" and "I clearly proved both by my statements and by my actions that I did not wish to contract with CALSTAR . . . ." Based on this, his argument appears to be that he did not consent to transport and treatment by CALSTAR, a point that we address in the next section. Moreover, we are not persuaded that by recasting his contention that he did not consent as "I did not waive my right not to consent," Carrick would be entitled to invoke the higher standard of proof applicable to claims of waiver.

***Substantial Evidence Supports the Trial Court's Implied Finding that Carrick
Consented to Transport and Treatment by CALSTAR***

At many points in his brief, Carrick argues that he did not agree to be transported by CALSTAR. This issue was contested in the trial court.

On appeal, Carrick focuses on and reargues the evidence that supports his contention that he did not consent to be transported. He argues that he only grunted when Cunningham said he was calling CALSTAR. Furthermore, he contends the flight nurses did not report that they obtained his consent in their Transport Medical Record and that the nurses did not mention obtaining his consent until after he disputed CALSTAR's bill. He also argues that the nurses had no reason to ask him whether he wanted to be transported because they thought he was the one who called 911 and believed he had already requested transport. And he contends the nurses should have removed the oxygen mask so that he could answer. He relies on Cunningham's testimony that he (Cunningham) did not hear the nurses ask Carrick if he consented to helicopter transport. Carrick asserts that while the nurses testified that he was fully oriented, Cunningham testified that he was "slightly disoriented." He argues both that the nurses did not apply the proper tests to determine whether he was oriented and that they did not test him at all. He asserts that the nurses had every reason to lie "to protect their company and their jobs" because CALSTAR's margins were " 'razor thin' according to John Bunner."

Carrick made most of these arguments in the trial court. Essentially, he is asking us to reweigh the evidence on the contested issue whether he consented to helicopter transport. That is not our role. Under the substantial evidence standard of review, we determine whether there is substantial evidence to support the trial court's factual finding that Carrick consented to be transported by CALSTAR. (*Bowers, supra,* 150 Cal.App.3d at pp. 873-874.) Although there may be evidence, as argued by Carrick, that supports a finding that he did not consent, that is not grounds for reversal when substantial evidence supports the trial court's finding and the judgment. (*Ibid.*)

The following substantial evidence supports the trial court's finding. Although Cunningham testified that Carrick grunted when he first told him that a helicopter was on its way, he also testified that after Carrick was on oxygen for a few minutes, he was able to speak. Before the nurses arrived, Carrick answered questions about his pain and told Cunningham how the bee stings occurred. Both nurses testified that by the time they arrived, Carrick was alert and oriented and that he nodded his head and said the word "yes" when they asked him whether he consented to be transported by helicopter. Contrary to Carrick's assertion, the nurses' Transport Medical Record states that the nurses obtained "Verbal consent for helicopter transport from [patient]" when they first contacted him. The nurses testified that they prepared the Transport Medical Record at the end of their shift on the day of the incident. The report itself indicates that it was prepared the morning after Carrick was transported and has not been modified since then. Although Cunningham testified that he did not hear the nurses ask Carrick for consent to transport him, he also stated that he stepped out of the van when the nurses arrived because it was a confined space. A reasonable inference from that testimony is that he was not in a position to hear the exchange between the nurses and Carrick.

In addition, that Cunningham did not hear Carrick consent to transport but did hear him refuse intubation may be explained by the timing of events. The nurses did not discuss airway intervention with Carrick until after they removed him from the van and placed him on the spine board. They discussed it with him again shortly before takeoff. Cunningham was outside the van when the nurses treated Carrick and was with Carrick when he was loaded onto the helicopter. Cunningham testified that after he told Carrick the helicopter was on the way, he understood Carrick's grunt to mean "yes" and "get me there." It took three minutes to drive from the van to the helicopter. There is no evidence that Carrick objected to helicopter transport while being moved from the van to the helicopter. Reasonable inferences from Abbruzzese's testimony that Carrick never refused helicopter transport are that he did not object while being treated by the nurses at

20

the scene, while being driven from the van to the helicopter, or while being loaded onto the helicopter. In addition, Carrick testified that he could not recall either accepting or declining transport by CALSTAR.

This testimony by Cunningham, the flight nurses, and Carrick; the Transport Medical Record; and the reasonable inferences therefrom provide substantial evidence that supports the trial court's finding of consent.

To support his position, Carrick quotes from a letter by Aimee Levine to CALSTAR dated December 19, 2010. Although a copy of the letter was attached to Carrick's answer, he did not offer it as evidence at trial; his opening brief acknowledges that the letter was not in evidence. As we have already explained, documents and facts that were not presented to the trial court cannot be considered on appeal and the appellate court will generally disregard arguments that are based on such matter. (*Pulver*, *supra,* 182 Cal.App.3d at p. 632; *Kendall*, *supra,* 197 Cal.App.3d at p. 625.)

Although Levine's letter was not presented to the trier of fact, the court allowed Carrick to make an offer of proof that Levine would testify that he resisted cooperating with the nurses, that he "struggled against" accepting transport and treatment from them, and that the nurses were "very forceful with [him] and leading [him] in the direction of what [he] should do." Presumably, the court weighed Carrick's offer of proof against the testimony of the flight nurses, which presented a very different picture on the question of consent. On appeal, Carrick asks us to reweigh that evidence. As we have explained, that is not our role under our standard of review.

*Competency of and Necessity for CALSTAR's Treatment and Other Fact Issues*

Carrick makes several arguments challenging the competency of the CALSTAR crew and the necessity for the treatment he received. We understand his arguments to include: (1) that the nurses never contacted their "Base Controlling Physician" about Carrick or whether to transport him; (2) that the nurses did not know enough about the

21

different types of anaphylaxis and could have given him "the wrong treatment"; and (3) that the nurse's job could have been done by a paramedic who would be paid $20 per hour.

Carrick raised all of these points in the trial court. Abbruzzese testified that, unlike paramedics, flight nurses do not customarily contact the base physician under the circumstances presented in this case and that she had experience treating bee stings. Unlike the firefighters, who were limited to administering oxygen, sugar, or the patient's own medication, the nurses were authorized to administer intravenous fluids and medications they carried with them. There was no evidence that the nurses administered the wrong medications or treated Carrick's condition inappropriately. According to the nurses' report, when the helicopter took off, Carrick's tongue was swollen, his blood pressure was low and his skin was pale; he also complained of difficulty breathing. When they arrived at the hospital, Carrick's vital signs had improved, his tongue was less swollen, and his breathing had improved. While cross-examining Abbruzzese, Carrick acknowledged that EMT's cannot do the type of interventions the nurses did.

Carrick argues that he is not responsible for CALSTAR's bill because by the time the nurses got to the scene, they were no longer needed. He contends that his treatment was delayed by CALFIRE and CALSTAR and that he would have gotten to the emergency room faster if his friends had been allowed to take him. He does not point to any particular error by the trial court and merely reargues the evidence, repeating the same arguments he made to the court below.

In summary, Carrick raised the competency of and the necessity for the treatment he received from CALSTAR in the trial court. On appeal, he asks us to reweigh the evidence presented on these issues. As set forth above, substantial evidence supports the trial court's implied findings that the CALSTAR nurses competently treated Carrick's condition and that the treatment was necessary. Indeed, they may have saved his life.

22

Carrick contends that CALSTAR's services were unreasonably priced and attempts to reargue the evidence on this point, too. In support of this contention, he cites a report by Kent Burdick, the Medical Director for Emergency Medical Services in Santa Cruz County with statistics for trauma admissions and air transports in that county. The report was not before the trial court. As we have stated, documents and facts that were not presented to the trial court cannot be considered on appeal and the appellate court will generally disregard arguments that are based on such matter. (*Pulver*, *supra*, 182 Cal.App.3d at p. 632; *Kendall*, *supra*, 197 Cal.App.3d at p. 625.) Carrick has not asked us to judicially notice the report and does not present any argument that supports the conclusion that it is judicially noticeable on appeal. Even if it is judicially noticeable, we question its relevance since it covers Santa Cruz County and Carrick was transported in Santa Clara County. For these reasons, we shall disregard any argument based on Burdick's report.

Carrick also argues that (1) CALFIRE should have paid CALSTAR's bill because CALFIRE "carelessly" ordered the helicopter for its own "reassurance, not [Carrick's] well being" and to get him a shot of Epinephrine; and (2) the trial court erred when it failed to consider why CALFIRE was not charged for the helicopter transport. Carrick made these same arguments at trial and they were rejected by the trial court. In addition, nothing in the record suggests the court ignored Carrick's arguments on this point. Once again, he asks us to reweigh the evidence and reconsider an argument that was rejected by the trier of fact. That is not our role on appeal.

23

*Failure to Follow Federal and State Regulations*

Carrick argues that CALSTAR did not have the authority to charge for its services because it was not following federal Department of Transportation and state regulations.[7] In particular, he complains that CALSTAR did not follow the "Dispute Handling" requirements in Government Code section 11000 et seq. and argues that all he ever received from CALSTAR was a demand for payment.

Government Code section 11000 et seq. is in part 1 of division 3 of title 2 of the Government Code. Title 2 of the code contains statutes that apply to the Government of the State of California; division 3 applies to the executive branch, and part 1 governs state departments and agencies. This is the only legal authority Carrick cites in support of this contention. Carrick does not tell us how the statutory scheme governing state departments and agencies applies to CALSTAR, nor does he point to any specific statutes that regulate the billing practices of non-profit companies like CALSTAR or that address dispute resolution. Rather than cite relevant legal authority, he relies on a whole section of the Government Code that on its face does not apply.

On this point, Carrick also refers to arguments in his trial brief, without repeating or discussing those points in his brief on appeal. "The appellant may not simply incorporate by reference arguments made in papers filed in the trial court, rather than briefing them on appeal." (*Keyes v. Bowen* (2010) 189 Cal.App.4th 647, 655-656.) Such practice does not comply with the requirement that an appellate brief "support each point by argument and, if possible, by citation of authority." (Cal. Rules of Court,

---

[7] In support of this contention, Carrick refers to Bob Hesse's deposition. Hesse was CALSTAR's Director of Medical Operations. On another point, Carrick refers to the deposition of Bill Finch, Cunningham's fire captain. Neither Hesse nor Finch testified at trial and their depositions were not in evidence. We shall disregard any argument based on their depositions. (*Pulver*, *supra,* 182 Cal.App.3d at p. 632; *Kendall*, *supra,* 197 Cal.App.3d at p. 625.)

24

rule 8.204(a)(1)(B).)  We shall therefore disregard arguments "incorporated by reference" from Carrick's trial brief.  (*Parker v. Wolters Kluwer United States, Inc.* (2007) 149 Cal.App.4th 285, 290-291.)  A litigant is not exempt from compliance with the rules of appellate practice when he or she acts without an attorney on appeal.  "Under the law, a party may choose to act as his or her own attorney.  [Citations.]  '[S]uch a party is to be treated like any other party and is entitled to the same, but no greater consideration than other litigants and attorneys.  [Citation.]'  [Citations]."  (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246-1247.)

Since Carrick fails to articulate a well-reasoned argument supported by relevant legal authority, we shall treat his contention that CALSTAR failed to follow state law governing dispute resolution as waived.  (*Niko*, *supra*, 144 Cal.App.4th at p. 368; *Stanley*, *supra*, 10 Cal.4th at p. 793.)

### *Other Legal Issues*

Carrick raises several other legal issues, but fails to present well-reasoned arguments supported by citation to relevant legal authority on these points as well.  This includes his arguments that:  (1) since he told Hamernick not to call 911, he was estopped from later changing his declaration and agreeing to services; (2) he was under duress at the time he consented and that his consent was procured by undue influence because he was strapped to a backboard and wearing an oxygen mask;[8] (3) the statutory requirements for oral contracts were not met; and (4) he never waived his "right to not contract for treatment or transport."  This also includes his arguments based on the United States and California Constitutions, which seems to be that there are constitutional protections

---

[8]  This claim is belied by the Transport Medical Record, which indicates that he consented shortly after the nurses arrived at 9:03 p.m. and was not placed on a back board until 9:18 p.m.

against enforcing contracts that are "unilaterally imposed by one party against another," and his claim based on the constitutional prohibition against bills of attainder.  Since Carrick fails to articulate well-reasoned arguments supported by relevant legal authority on these points, we shall treat these contentions as waived and pass them without further consideration.  (*Niko*, *supra*, 144 Cal.App.4th at p. 368; *Stanley*, *supra*, 10 Cal.4th at p. 793.)

Under the heading "Bias," Carrick asserts that the trial court did not consider some of the arguments he made below.  He argues that the court "refused less costly options," refused to acknowledge protections in California law against illegal contracts, and "refused to acknowledge even the lack of any contract."  However, Carrick does not point us to any part of the record that demonstrates any bias by the trial court.  Our review of the record indicates that the court read Carrick's trial brief and listened to his closing argument, which covered these issues.  That the court rejected Carrick's contentions does not mean the court was biased against Carrick.

### Denial of Motion For New Trial

Carrick's argument on the motion for new trial seems to be that the court should have granted his motion because the testimony of Deto and Hamernick would have helped him prevail on the consent issue.

The standard of review of an order on a new trial motion is the deferential abuse of discretion standard.  (*Sherman v. Kinetic Concepts, Inc*. (1998) 67 Cal.App.4th 1152, 1160 (*Sherman*).)  But in reviewing an order *denying* a new trial, we review the entire record and make an independent determination whether the error that is the basis of the new trial request was prejudicial.  (*Id.* at pp. 1160-1161.)

Although Carrick's new trial motion did not specify the statutory basis for the motion, the court concluded that it was based on an alleged irregularity in the trial proceedings, citing Code of Civil Procedure section 657, subdivision (1).  That code

26

section provides that a new trial may be had for "[i]rregularity in the proceedings of the court, jury or adverse party, or any order of the court or abuse of discretion by which either party was prevented from having a fair trial." Under the "order of the court or abuse of discretion" prong, evidentiary rulings by which relevant evidence is erroneously excluded may be grounds for a new trial if prejudicial to the moving party's right to a fair trial. (*Townsend v. Gonzalez* (1957) 150 Cal.App.2d 241, 249-250.)

Carrick does not cite Code of Civil Procedure section 657 or provide any reasoned argument with citation to legal authority explaining why the court erred when it denied his new trial motion. As with his other contentions, we conclude that he has waived any claim of error from the denial of his new trial motion. Moreover, as we have explained, Carrick has not met his burden of demonstrating that the statements of Hamernick and Deto were erroneously excluded. For these reasons, we hold that the court did not abuse its discretion when it denied Carrick's new trial motion.

## DISPOSITION

The judgment is affirmed.

_____
Márquez, J.

WE CONCUR:


_____
Elia, Acting P. J.



_____
Bamattre-Manoukian, J.